

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS:PJC
F. #2021R00440

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 13, 2026

By ECF

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Taesung Kim
             Criminal Docket No. 23-191 (DG)

Dear Judge Gujarati:

        Defendant Taesung Kim used a complex money laundering operation to facilitate a large-scale conspiracy to defraud Medicare through the dispensing of medically unnecessary prescription medications. His pharmacies paid cash kickbacks to Medicare beneficiaries to induce them to seek out profitable podiatry prescriptions, and he paid doctors' staff and rent costs to induce them to steer prescriptions to his pharmacies. Kim and his co-conspirators caused in excess of $24 million in losses to Medicare, a quarter of which Kim pocketed himself.

        On January 27, 2026, the Court is scheduled to sentence Kim in connection with his plea to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Considering the seriousness of the offense and the defendant's role, the harm caused to Medicare, the significant need for deterrence, and the need to avoid unwarranted sentencing disparities, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 63 to 78 months' imprisonment calculated in the plea agreement is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a).[1]  The government also respectfully requests that the Court order Kim to pay restitution in the amount of $24,411,567.11 to Medicare and enter a forfeiture money judgment of $6 million, as agreed to in the plea agreement.

I.      Background & Procedural History

        Kim was at the center of a constellation of fraudulent pharmacies in Brooklyn, Queens, and Hawaii. His ownership and control extended to Huikang Pharmacy Inc., 88 Pharmacy

---

      [1]     As explained further below, the Guidelines range calculated in the plea agreement is lower than the correct Guidelines range of 78 to 97 months' imprisonment.

Inc., 888 Pharmacy Inc., Elmcare Pharmacy Inc., NY Elm Pharmacy Inc., Silver Care Pharmacy Inc., Happy Care Inc., Broadway Care, Inc., and NY Health Pharmacy Inc.  (See Presentence Investigation Report ("PSR") ¶ 21.)  Several of these pharmacies were obtained and maintained as "backups" in case law enforcement or regulatory scrutiny caused the closure of one, in which case another would be used in its place.  (See id. ¶ 40.)  And Happy Care—the Hawaii-based pharmacy—appears to have been obtained in order to expand Kim's criminal scheme to the Pacific.

A substantial portion of Kim's pharmacies' business was defrauding Medicare and Medicaid, vital federal health care programs that provide insurance coverage to the elderly and those who cannot afford health insurance.  (Id. ¶¶ 5-11.)  As charged in the indictment and outlined in the PSR, between approximately January 2015 and December 2022, Kim and his co-conspirators conspired to defraud federal health care programs by submitting claims for medically unnecessary prescription drugs and over-the-counter ("OTC") items that were not dispensed, procuring prescriptions through bribes and kickbacks and laundering the proceeds of the fraud to disguise the kickbacks and share profits.  (See id. ¶ 35.)  While certain Medicare Part C plans offer enrollees a monthly allowance for OTC items, such as bandages and vitamins, Kim and his co-conspirators paid their customers the cash equivalent of their customers' OTC cards to induce the customers to fill prescriptions at Kim's pharmacies, falsely submitting claims for OTC items that were not provided.  Kim also entered into arrangements with doctors in which he paid for their staff and physical space in exchange for the doctors sending profitable podiatry prescriptions, including pain patches, to Kim's pharmacies.  (See id. ¶ 37.)

Confidential source ("CS") video recordings made at Elmcare and NY Elm during the charged scheme are emblematic of the operation of Kim's pharmacies.  During different visits to these pharmacies over the course of approximately one year,[2] a CS was promised cash in exchange for his/her OTC card and supermarket gift certificates in exchange for profitable podiatry medication prescriptions.  (Id. ¶ 38.)  The CS did as he/she was instructed—went to Kim's pharmacy's doctor, obtained podiatry prescriptions, and returned to Elmcare with prescriptions. In exchange, the CS received approximately $150 cash in exchange for his/her OTC card and $3 in supermarket gift certificates per prescription.  When the CS indicated that he/she did not need the medications being dispensed, he/she was told he/she had to take them.[3]

The CS also caught Kim and his co-conspirator's transition to a backup pharmacy due to a lost insurance contract.  In the middle of making recordings, Elmcare became NY Elm, which paperwork and cooperating witnesses confirmed was because Elmcare had lost its main insurance contract.  Paperwork filed by Kim's co-conspirator, Feng Jiang, falsely indicated that Elmcare's customers would be transferred to Silver Care Pharmacy, another Kim pharmacy, when in reality Elmcare became NY Elm.  (ECF No. 1 (the "Indictment"), ¶ 31(e).)  The total amount

---

[2]    The CS's visits to Elmcare and NY Elm were video and audio recorded and translated from Mandarin to English by an agent fluent in both languages.

[3]    Additional details regarding the CS's interactions with Kim's employees were set forth in the government's sentencing submission in the related case, United States v. Jiang, No. 24-CR-264, ECF No. 38.

of money misappropriated from Medicare through the scheme was at least $24 million.  (PSR ¶ 43.)

In December 2022, concurrent with the arrest of two of Kim's low-level employees, law enforcement searched NY Elm and three other pharmacies, including Happy Care in Hawaii. At NY Elm, agents recovered thousands of dollars in cash in an unplugged refrigerator below the front counter, cash in prepared envelopes consistent with what the CS was given for his/her OTC card, thousands of dollars in supermarket gift certificates to various neighborhood supermarkets, intake forms for a nearby podiatry doctor who was a top prescriber at Elmcare and NY Elm, and numerous customers' OTC cards.  (Id. ¶ 45.)  Law enforcement also obtained a cellphone from one of Kim's co-conspirators, which contained group messages detailing checks Kim wrote to several money laundering entities.

Pharmacies like Kim's that primarily cater to Medicare beneficiaries and Medicaid recipients do not generate significant cash.  In order to obtain cash for paying patients illegal kickbacks and bribes, Kim wrote hundreds of checks per year to "trading" companies that created the appearance of legitimate business but were used to produce bulk cash.  (Id. ¶ 44.)  Kim also wrote checks to these companies to obtain cash that could be distributed among the pharmacies' owners, which he documented in group text messages.

After the December 2022 searches, Kim met with his co-conspirators to assess the damage and formulate a plan.  He was captured on recordings a cooperating witness made discussing with his co-conspirators the prospect of back dating invoices to legitimize the checks to trading companies.  During the meetings, Kim expressed little concern about the kickbacks paid, but he emphasized to his co-conspirators that the checks constituted money laundering, which he was concerned about.  (See id. ¶ 46.)  Kim and his co-conspirators also discussed potentially leaving the United States and how to safeguard some of their assets from seizure by the government by moving the money into trusts in others' names.  (See id.)  Kim followed through with some of these ideas, moving the title of his primary residence into his child's name shortly after these meetings.

On May 2, 2023, Kim was arraigned on an indictment charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, conspiracy to defraud the United States and pay health care kickbacks, in violation of 18 U.S.C. § 371, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and money laundering, in violation of 18 U.S.C. §1956(a)(1)(B)(i).  (See Indictment.)  Kim was detained until approximately May 12, 2023, at which point he posted a substantial bond securing his release.  On December 10, 2024, Kim pleaded guilty to conspiracy to commit money laundering.  (PSR ¶ 1.)

In January 2025, Judge Ross sentenced co-conspirator Hua Huang, a clerk at Elmcare and NY Elm, to two years' probation.  See United States v. Huang, No. 23-CR-234, ECF No. 47.  In October 2025, Judge Ross sentenced Kim's associate, Jiang, to 15 months' imprisonment.  See United States v. Jiang, No. 24-CR-264, ECF No. 46.

II.    Kim's Guidelines Range

        The government agrees with the Guidelines calculation set forth in the PSR, as corrected by the addenda, which differs slightly from the government's estimate in the plea agreement.  Specifically, the government submits that the correct offense level is 28, the correct criminal history category is I, and the correct Guidelines range of imprisonment is 78 to 97 months.

        The government's calculation, to which the defendant stipulated in the plea agreement, is as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. §§ 2X1.1, 2B1.1(a)) | 6 |
| Loss exceeding $9.5 million (U.S.S.G. §§ 2B1.1(b)(1)(K)) | +<u>20</u> |
| Base offense level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1) | <u>26</u> |
| Conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Leadership enhancement (U.S.S.G. § 3B1.1(a)) | +2 |
| Acceptance (U.S.S.G. § 3E1.1(a),(b)) | -3 |
| Global resolution | <u>-1</u> |
| Total adjusted offense level | <u>26</u> |

With a Criminal History Category I and a total adjusted offense level of 26, the government calculates Kim's Guidelines range to be 63 to 78 months' imprisonment.

        Probation included in its calculations a two-point enhancement for obstruction of justice due to Kim's deletion of text messages and attempted procurement of falsified invoices in connection with the money laundering transactions.  (PSR ¶ 58.)  Therefore, with the additional one-point reduction, Probation calculates the total adjusted offense level to be 28.  (Id. ¶¶ 62, 110.) With a Criminal History Category I and a total adjusted offense level of 28, Kim's Guidelines range of imprisonment is 78 to 97 months.

III.    A Sentence Within the Guidelines Calculated in the Plea Agreement is Appropriate

    A.    Legal Standard

        In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns.  543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Second Circuit declined to

4

determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

B.    Discussion

The government respectfully requests that the Court impose a sentence within the Guidelines range of 63 to 78 months' imprisonment calculated in the plea agreement because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a).

1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of the offense warrant a sentence of between 63 and 78 months' imprisonment. For approximately seven years, Kim led a wide-ranging scheme designed to steal $24 million from federal health care programs. Kim built an empire of pharmacies across Brooklyn and Queens and he planned to extend his fraud to Hawaii. His greed led him to open more and more pharmacies, and he set up his criminal network of pharmacies in a way that dispersed the ownership so that the house of cards would not collapse if one pharmacy was investigated. Indeed, several of his businesses were in his wife's name, whose primary role was as a homemaker and who never stepped foot in the pharmacies. And when Elmcare closed, it changed in name and ownership only to NY Elm so it would not come under scrutiny. Kim and his employees sent an endless stream of customers to a cooperating doctor who was effectively on their payroll, leading the doctor to complain over text messages to one of Kim's co-conspirators that the elderly patients never stopped coming. Kim installed deputies to manage the sprawling

5

scheme, Jiang and co-defendant Dacheng Lu, to oversee the Brooklyn and Queens operations because they were too big to manage by himself. Kim spent his day signing numerous checks to trading companies to create a paper trail for the web of transactions needed to generate cash for paying customers and to dispense cash profits to himself and his co-conspirators. He also ferried the bulk of the cash from the money launderers to the pharmacies and his business partners so that it could be paid out as illegal kickbacks and profits. The scheme was lengthy and calculated, and it warrants serious punishment.

The history and characteristics of the defendant also warrant such a sentence. The PSR makes clear that Kim is educated, has a longstanding marriage, and raised two model first-generation American children. He had no need to commit these crimes, and he appears to have acted out of pure greed. He reported having a middle-income "contented childhood" in South Korea, where he obtained a bachelors degree. (PSR ¶¶ 73, 80.) He has two adult children, one of whom is attending law school, and the other of which is a Navy pilot. (Id. ¶ 73.)

Yet the vast duration of Kim's criminal conduct—more than seven years—makes clear that his actions cannot be dismissed as an aberration of his character. The evidence also demonstrates that Kim took advantage of those who were less experienced in the healthcare industry, lacked immigration status in the United States, and were attempting to model their own success off of what they witnessed in Kim. For example, as Judge Ross heard at Huang's sentencing, Huang was a non-citizen who was paid minimum wage to act as the front line of the scheme, coaching customers to see specific doctors, some of whom Kim was paying to steer prescriptions to his pharmacies. Kim put her in legal jeopardy, as she was conducting the hand-to-hand kickback payments with the customers. And as Judge Ross heard at Jiang's sentencing, Jiang was also an immigrant who had no prior experience in the pharmacy industry and became a business partner of Kim's in order to support his extended immigrant family. He undoubtedly saw Kim's expanding wealth and business empire and wished to become a successful businessman like Kim. But Kim's business model centered on fraudulent prescriptions, illicit kickbacks, and secretive money laundering, and it brought down Kim and those who worked for him.

2. A Sentence of 63 to 78 Months' Imprisonment Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment

The 3553(a) factors also require that the punishment reflect the seriousness of the offense. Health care fraud and the laundering that facilitates and obfuscates it are unquestionably serious. Annual losses tied to health care fraud are estimated to be in the tens of billions of dollars,[4] and money laundering exacerbates these losses by making health care fraud schemes harder to detect and fraud proceeds harder to recover. Federal health care programs, in particular, struggle with insolvency, and schemes like the defendant's degrade patient care, cause patient harm, and drive legitimate actors from the system while driving up costs for taxpayers.

---

[4]     https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/#:~:text=The%20National%20Health%20Care%20Anti-Fraud%20Association%20%28NHCAA%29%20estimates,the%20tens%20of%20billions%20of%20dollars%20each%20year (last accessed Oct. 20, 2025).

A sentence of 63 to 78 months reflects the seriousness of the crime, promotes respect for the law, and provides just punishment. To allow a blatant bribery and money laundering scheme like the one Kim has been convicted of to be punished through only economic penalties like restitution—which Kim appears to have no substantial ability to satisfy—would grossly undermine the seriousness of the offense and send a message that crimes like this are worth committing because defendants are unlikely to face serious punishment.

Indeed, courts and Congress have long indicated that white-collar crimes like Kim's require meaningful punishment to outweigh the substantial incentives that exist to engage in such potentially lucrative conduct. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, C.J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); see also S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime and government corruption. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

Kim and his co-conspirators expressly viewed kickback and health care fraud as unserious offenses in recorded conversations. He structured his business in a way that dispersed ownership to avoid detection and exacerbate the extent of the financial harm against federal health care programs. These facts highlight the need for the Court to reaffirm that white-collar crimes are serious crimes with serious consequences and to provide just punishment through a substantial sentence.

3.    A Substantial Sentence Affords Adequate Deterrence and Protects the Public

A sentence of 63 to 78 months is also necessary to deter others from engaging in similar schemes and to protect the public from the pilfering of vital, resource-limited public health programs. As the Second Circuit has noted, significant sentences are particularly appropriate in white-collar crimes to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white-collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.").

Further, health care fraud is a complicated crime involving difficult questions at the interstices of the medical and legal professions.  For these and other reasons, the likelihood of detection is relatively low.  See Diane E. Hoffmann, Physicians Who Break the Law, 53 St. Louis U.L.J. 1049, 1052 (2009) (pointing to empirical research showing that professionals believe the probability of getting caught committing a white-collar crime is low and that fraud is "relatively easy to hide and hard to detect" because the acts involved "tend to be made up of complex, sophisticated, and relatively technical actions" that are "intermingled with legitimate behavior" (internal quotations and citations omitted)).  Indeed, Kim and his co-conspirators went through the motions to give the appearance of legitimacy to the prescriptions being dispensed, having the CS see a doctor and receive prescriptions and scanning eligible OTC items to give the appearance that they were dispensed.  Kim and his co-conspirators also constructed a web of financial transactions to disguise the amount of money they were making and the amount of cash they were paying out as kickbacks.  They wrote checks to trading companies that gave the appearance of doing real business, when in reality they were converting bulk cash for the payment of kickbacks and to distribute profits.

Kim and his co-conspirators likely calculated that the risks of going to these lengths were not outweighed by the potential punishment they could face.  Indeed, Kim faced this calculus every time he purchased and opened another pharmacy, including in Hawaii.  His conviction demonstrates that his calculation was incorrect, but by imposing a Guidelines sentence, the Court will show other would-be fraudsters that white-collar crimes come with substantial penalties and are not worth the risk.  See Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties.").

Health care fraud is also not a victimless crime.  Money diverted through schemes like Kim's depletes financial resources needed to pay for legitimate health care services that the elderly and indigent desperately need.  Every dollar that went to Kim and his co-conspirators' pockets could have instead paid for legitimate treatments, medications, and services.  Schemes like this also sap the resources needed to identify, investigate, and prosecute fraud schemes, while also driving up health insurance costs for other citizens.  Federal health care programs operate within a trust-based system because their significant volume of claims and the need to quickly deliver medical care to those who need it makes it impossible to pre-clear claims as they are submitted.  Kim abused that trust for his own financial gain, making the system worse for all involved.  Finally, fraudulent pharmacies that submit claims for medically unnecessary prescriptions and attract customers through kickbacks corrupt the marketplace and drive out legitimate actors and aspiring business owners, making real services harder to obtain.  Those who cannot compete with fraudsters turn to fraud themselves, thus perpetuating the cycle.  A sentence of 63 to 78 months will deter others from engaging in similar conduct and help break the cycle.

Finally, Kim participated in this scheme for years through multiple businesses spread out across New York City and beyond, repeatedly choosing to take part in a criminal enterprise.  His willful and knowing decision to engage in such criminality to line his pockets suggests that a meaningful sentence is necessary to deter him from future criminality.  A sentence of 63 to 78 months' imprisonment will signal to Kim and other pharmacy fraudsters that these schemes carry more punishment than just the potential requirement to repay the fraud proceeds if

one is caught, which is no punishment at all in cases where defendants, like Kim, cannot afford to pay a substantial judgment or have already dissipated the fraud proceeds.

### 4. Avoiding Unwarranted Sentencing Disparities

A sentence of 63 to 78 months' imprisonment is also necessary to avoid unwarranted sentencing disparities in this case, this district, and nationally. Most relevant, Huang, who was a low-level employee in the scheme, received a sentence of two years' probation. See United States v. Huang, No. 23-CR-234, ECF No. 47. Kim's number two in the scheme, Jiang, received a sentence of 15 months' imprisonment. See United States v. Jiang, No. 24-CR-264, ECF No. 46. As the Guidelines calculation and their respective roles make clear, Kim's conduct warrants a sentence multiples higher than Jiang and within the range of 63 to 78 months' imprisonment.

Federal sentencing statistics also show that a Guidelines sentence is appropriate. For the fiscal years 2020 through 2024, of the approximately 55 defendants whose Guidelines were based on a Total Offense Level of 26, a Criminal History Category I, and whose primary Guideline was Section 2S1.1, the average length of imprisonment was 50 months' imprisonment and the median length of imprisonment was 51 months' imprisonment.[5] While the mean and median sentences imposed are slightly below the government's requested Guidelines range of 63 to 78 months' imprisonment, the scope and duration of Kim's scheme and its execution in a manner meant to perpetuate and disguise it make a sentence between 63 and 78 months of imprisonment wholly appropriate.

## IV. Restitution

Kim has agreed to pay restitution, which is appropriate in this case. See 18 U.S.C. § 3363A(3) ("The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense."). In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted). The government respectfully submits that the Court should order Kim to pay restitution in the amount of $24,411,567.11 to Medicare, which represents the amount of money Medicare paid for medications that were medically unnecessary and/or induced by the payment of illegal kickbacks and bribes. Restitution should be joint and several with his co-conspirators, including Huang, Jiang, and other co-conspirators who have not yet been sentenced. Kim agreed to this restitution figure in his plea agreement. (Plea Agreement ¶ 1(e).) The Court should also impose a forfeiture money judgment in the amount of $6,000,000, as agreed to in Kim's plea agreement, which as of the submission of this letter has been partially satisfied. (Id. ¶¶ 6-12.)

---

[5] U.S. Sentencing Commission, Judiciary Sentencing Information (JSIN), *available at* https://jsin.ussc.gov/analytics/saw.dll?Dashboard. (last visited Jan. 10, 2026).

9

V.    <u>Conclusion</u>

For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of 63 to 78 months' imprisonment and order Kim to pay restitution and forfeiture.

Respectfully submitted,

LORINDA LARYEA
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By:    <u>/s/Patrick J. Campbell</u>
Patrick J. Campbell
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice
(202) 262-7067

cc:    Clerk of Court (DG) (via email)
Kevin Keating, Esq. (via ECF)
Maxine Marquez, U.S.P.O. (via email)